IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GREENSTAR, LLC and GREENSTAR ALLENTOWN, LLC f/k/a PENN ACQUISITION SUB, LLC, ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) | Civ. No. 10-746-SLR |
| TODD A. HELLER and TODD HELLER, INC., ) ) ) ) | |
| Defendants. ) | |

Stephen C. Norman, Esquire, Arthur L. Dent, Esquire and R. Christian Walker, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Charlie Baumann, Esquire, David Harrell, Esquire, and John J. Mitchell, Esquire of Locke Lord Bissell & Liddell LLP.

William J. Wade, Esquire, Chad M. Shandler, Esquire, Laura D. Hatcher, Esquire, and Elizabeth R. He, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware. Counsel for Defendants. Of Counsel: Martha N. Donovon, Esquire of Norris McLaughlin & Marcus, P.A.

**MEMORANDUM OPINION**

Dated:  September 30, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Greenstar, LLC ("Greenstar") and Greenstar Allentown, LLC f/k/a Penn Acquisition Sub, LLC ("Greenstar Allentown") (collectively, "plaintiffs") filed their complaint against Todd A. Heller ("Heller") and Todd Heller, Inc. ("THI") (collectively, "defendants") on August 31, 2010. Plaintiffs allege breach of contract and fraud in connection with their purchase of a commercial recycling business located in Northampton, Pennsylvania (the "Northampton facility") from defendants in September 2007. (D.I. 1) Plaintiffs also sought an injunction preventing defendants from presenting a promissory note for the balance of plaintiffs' purchase price for the Northampton facility. (Id.; D.I. 3) A stipulation and order was entered by the court on September 13, 2010 reflecting the parties' agreement that the status quo would be maintained pending further order of the court. (D.I. 17) In lieu of an answer, defendants filed a motion to dismiss the complaint. (D.I. 20) That motion is currently before the court. For the reasons that follow, the court grants in part and denies in part defendants' motion.

## II. BACKGROUND[1]

Greenstar is a Delaware liability company with its principal place of business in Houston, Texas. (D.I. 1 at ¶ 1) The sole member of Greenstar is Greenstar Allentown, a Delaware limited liability company. (Id.) Heller is a citizen of the Commonwealth of Pennsylvania and is the president of THI, a Pennsylvania corporation having its registered office in Allentown, Pennsylvania. (Id. at ¶¶ 3-4)

---

[1]For purposes of defendants' motion to dismiss, the allegations of the complaint are taken as true.

Plaintiffs purchased the recycling business at the Northampton facility from defendants in September 2007 for a total purchase price of $58.75 million. (D.I. 1 at ¶ 8) A portion of this price, $11.41 million, was provided for by a promissory note maturing on September 6, 2010 (hereinafter, "the Note"). (*Id.*) The Note is secured by the Irrevocable Standby Letter of Credit Number 1 (the "Letter of Credit") issued by Ulster Bank Ireland Limited ("Ulster") in the face amount of $11.41 million. (*Id.*)

The parties executed an Asset Purchase Agreement dated September 4, 2007 ("the Agreement") providing the terms of the sale of the recycling business at the Northampton facility.[2] The Agreement provides that it shall be construed in accordance with Delaware law and provides that disputes thereunder shall be filed in this court.[3] (APA § 7.8)

The land on which the Northampton facility is owned is still owned by Heller; plaintiffs operate the facility pursuant to a lease agreement executed September 4, 2007. (D.I. 1 at ¶ 10) Excluded from the sale to plaintiffs were defendants' inventory, equipment, work in process, and "wastes," defined as "all containerized wastes or waste materials[.]" (APA § 1.2, Annex A-4)

After the closing, the Northampton facility was inspected by the Pennsylvania Department of Environmental Protection ("DEP") and plaintiffs subsequently discovered, through a file review, that Heller and THI had been advised by DEP as early as July 2003 that the Northampton facility was the subject of a DEP inquiry

---

[2]The Agreement is docketed at D.I. 5, exhibit 1. Hereinafter the court will cite to the Agreement's provisions as "APA § ____" for convenience.

[3]Defendants do not dispute jurisdiction or venue.

2

relating to mixed broken glass ("MBG") stockpiles on the property. (*Id.* at ¶ 12) The

regulation identified by the DEP in its July 2003 correspondence to defendants, section

285.113 of the DEP's Municipal Waste Regulations, provides that municipal waste may

not be stored for more than a year without DEP approval. (*Id.*) The DEP did not

approve of defendants' storage of MBG at the Northampton facility, and required

defendants to develop

> [a] plan that provides for the rate of removal, marketing or disposal, and
> expected timeframe to remove the waste contaminants and reduce the size of
> the MBG stockpile to one that accumulates no more than the amount of MBG
> generated within one (1) year to comply with the regulations.

(*Id.* at ¶ 13) Defendants never submitted a plan to the DEP; however, defendants

actively coordinated compliance efforts with the DEP, including the provision of monthly

updates, through August 2007 – a month before the effective date of the Agreement.

(*Id.* at ¶¶ 14-15) Defendants never achieved compliance, and the DEP continues to

seek removal of the MBG piles. (*Id.* at ¶¶ 14, 16)

Defendants did not disclose to plaintiffs the DEP's ongoing inquiry and

investigation into the accumulated MBG. (*Id.* at ¶ 17) According to plaintiffs,

defendants' failure to disclose these issues violate numerous warranties and

representations under Article III of the Agreement, which provides as follows:

> 3.7 **Absence of Undisclosed Liabilities.** The Seller has not incurred any
> Liabilities[4] of any nature, except Liabilities (i) which are accrued on or reserved
> against in the Financial Statements or expressly set forth in the notes thereto, (ii)
> that are Liabilities which were incurred after May 31, 2007 in the Ordinary Course
> of Business or (iii) that do not exceed, individually or in the aggregate, $100,000.

---

[4]Broadly defined as "any debt, obligation, duty or liability of any nature," including
"unknown" and "unaccrued" liabilities, and strict liability (whether arising under
Environmental Laws or otherwise). (APA, Annex A-6)

3

. . .

3.10 **Inventory and Tonnage.** The Inventory, whether or not reflected in the Financial Statements, consists of a quality and quantity usable and salable in the Ordinary Course of Business. . . .

3.11 **Books and Records.** The books of account, minute books, stock record books and other records of the Seller, all of which have been made available to the Buyer, are complete and correct and have been maintained in accordance with sound business practices. . . .

3.14 **Title and Condition of Assets.** The Seller is the sole and exclusive owner of, and has good, marketable and indefeasible title to, or a valid leasehold or other contractual interest in, all of the Assets, Outbound Contracts, Excluded Equipment and the Inventory, personal and intangible, free and clear of all Encumbrances[5](except Permitted Encumbrances), and is exclusively entitled to possess and dispose of the same. . . .

3.17 **Compliance With Laws, Contracts.** (a) Except as set forth in Schedule 3.17[6] or except as would not or could not reasonably be expected to result, individually or in the aggregate, in a Liability in excess of $100,000, the Seller is not and has not been in the past four (4) years in violation of, and has not been given notice or been charged with any violation of, any Legal Requirement (including, without limitation, any Environmental Law) of any Governmental Authority. No event has occurred, and no condition or circumstance exists, that might (with or without notice or lapse of time) constitute or result directly or indirectly in a violation of any Legal Requirement. No investigation or review by any Governmental Authority is pending or, to the Seller Parties' Knowledge[7], threatened, nor has any Governmental Authority indicated an intention to conduct the same. . . .

3.21 **Environmental Matters.** Without in any manner limiting any other representation or warranty set forth in this Agreement:

---

[5]Including any restriction, claim, "encroachment," or "interference." (APA, Annex A-3)

[6]Schedule 3.17 sets forth governmental authorizations held by the seller necessary to permit it to conduct its current business. (APA § 3.17(a))

[7]"Knowledge" means, for individuals, actual awareness or constructive awareness (if they "could reasonably be expected to become aware of such fact or matter after due inquiry"). (APA, Annex A-6) For entities, knowledge is established if any director or key employee had actual knowledge or constructive knowledge, as defined above. (*Id.*)

(a) The Seller and the Business Facilities are and have been in full compliance with all Environmental Laws . . . .

(f) Except in compliance with Environmental Laws or except as otherwise disclosed . . . and to the Knowledge of the Seller Parties, no Hazardous Substances have been generated, extracted, mined, manufactured, stored, treated, disposed of, injected, or released (and no release is threatened), on, under, about or from any property adjacent to any Business Facility. . . .

(j) Neither the Seller nor any Business Facility is subject to any pending or Threatened Environmental Claim[8], and there are no present or past events, conditions, circumstances, activities, practices, incidents, actions, or plans which may give rise to any common law or statutory liability (including without limitation STRICT LIABILITY) under Environmental Laws or form the basis of any Environmental Claim, nor ha[s] the Seller voluntarily undertaken Environmental Response[9] to, or other decontamination or cleanup of, any Business Facility or other site or entered into any agreement for the payment of costs associated with such activity.

(k) The Seller has provided the Buyer with copies of all reports, assessments, inspections, investigations, correspondence (internal and external), analytical data, and other documents and records relating to the environmental condition of the Seller or the Business Facilities, their compliance with Environmental Laws, and/or Environmental Claims.

3.26 **Disclosure.** No representation or warranty or other statement of the Seller Parties contained herein, in schedules hereto or in any document or agreement contemplated hereby[,] contains any untrue statement of a material fact or fails to state a material fact necessary to make the statements herein or therein not

---

[8]Defined broadly as including, inter alia, any claim, demand, action, cost, expense, damage relating to any violation or potential violation or potential liability under any Environmental Law. (APA, Annex A-3) Also included is, "without limitation, any Loss incurred in connection with any investigation to determine whether Environmental Response is required" and monitoring. (*Id.*) An "Environmental Law" is broadly defined as any and all statutes, laws, rules, regulations, orders and the like by any governmental authority, including those relating to "storage, disposal, distribution or management of" any Hazardous Substances. (APA, Annex A-4)

[9]"'Environmental Response' means any action necessary to comply with and ensure compliance with Environmental Laws or to prevent, respond to, remove, remediate, investigate or monitor the release or threatened release of Hazardous Substances at, on, in, about, under, within or near the air, soil, surface water, groundwater, or other environmental media." (APA, Annex A-4)

misleading. There is no fact that has any specific application to Seller (other than general economic or industry conditions) and that materially adversely affects the assets, business, prospects, financial condition, or results of operations of Seller that has not been set forth in this Agreement. Seller has provided Buyer with true, accurate and complete copies of all documents listed or described in the Seller Parties' Disclosure Schedule.

(D.I. 1 at ¶ 18) Plaintiffs assert that each of these representations was false (and

known by defendants to be false) at the time of the closing because the nondisclosed

MBG stockpiles were both a liability and an encumbrance on the transferred assets.

(Id.)

The Agreement also provides that defendants will generally indemnify plaintiffs

for "each and every Loss[10] paid, imposed on or incurred by" plaintiffs "relating to,

resulting from or arising out of, or any allegation by any third party of:" (1) any

inaccuracies in any representation or warranty under the Agreement; (2) any breach;

and (3) "any fraud, intentional misrepresentation or similar circumstances."  (APA § 6.1)

In addition, the Agreement contains an "Environmental Indemnification" whereby

defendants agreed to reimburse plaintiffs for any Loss

directly or indirectly, relating to, resulting from or arising out of any Environmental Claim asserted against Buyer's Indemnified Persons or for which Buyer's Indemnified Persons otherwise becomes liable, or any actual or threatened violation of or noncompliance with, or any Environmental Response obligation

---

[10]"[A]ny loss, damage, injury, harm, detriment, decline in value, Liability, exposure, claim, demand, Proceeding, settlement, judgment, award, punitive damage award, fine, penalty, Tax, fee, charge, cost or expense (including, without limitation, costs of attempting to avoid or in opposing the imposition thereof, interest, penalties, costs of preparation and investigation, and the reasonable fees, disbursements and expenses of attorneys, accountants and other professional advisors), as well as with respect to compliance with the Requirements of Environmental Law, expenses of Remediation and any other remedial, removal, response, abatement, cleanup, investigative, monitoring, or record keeping costs and expenses, but shall not include consequential damages."  (APA, Annex A-6)

arising under, any Environmental Laws, in each case which has its basis in or which arises from any event, condition, circumstance, activity, practice, incident, action or plan existing, commencing, or occurring prior to the Closing and which relates in any way to (i) the Seller, or any of the Assets, Outbound Contracts, Excluded Equipment or Inventory, or the conduct of the Business prior to the Closing; (ii) the presence of any Hazardous Substances[11] exceeding naturally-occurring concentrations on, in, under or affecting all or any portion of any Business Facility, and any release or threatened release with respect to such Hazardous Substances; and/or (iii) the storage, disposal or treatment, or transportation for storage, disposal or treatment, of Hazardous Substances.

(APA § 6.2(a))

Plaintiffs sent a Claim Notice to defendants (pursuant to section 6.6(a) of the

Agreement, providing the procedure for the resolution of claims) on July 23, 2010

identifying the breaches of contract and misrepresentations claimed above. (D.I. 1 at ¶

25) Defendants were advised of plaintiffs' estimated cost to dispose of the MBG at the

Northampton facility, or $53/ton for a volume in excess of 200,000 tons, plus the

internal costs of processing. (*Id.*) Plaintiffs subsequently obtained an additional

estimate at a base rate of $52.50/ton. (*Id.*) Plaintiffs also notified defendants that,

pursuant to section 6.6(b) of the Agreement, plaintiffs "have the right to reduce the

principal amount of the Note held by Seller in an amount equal to the [monetary

obligation owing in indemnification]." (APA § 6.6(b); D.I. 1 at ¶ 25) The parties were

_____

11"(i) [S]ubstances, materials, or wastes that are or become classified or regulated under any applicable Environmental Law; (ii) those substances, materials, or wastes included within statutory and/or regulatory definitions or listings of 'hazardous substance,' 'special waste,' 'hazardous waste,' 'extremely hazardous substance,' 'solid waste,' 'medical waste,' 'regulated substance,' 'hazardous materials,' 'toxic substances,' or 'air contaminant' under any Environmental Law; and/or (iii) any substance, material, or waste which is or contains: (A) petroleum, oil or any fraction thereof; (b) explosives; or (c) radioactive materials (including naturally occurring radioactive materials)." (APA, Annex A-5)

unable to resolve the dispute,[12] and plaintiffs informed defendants on August 31, 2010 that they had offset against the Note.  (D.I. 1 at ¶ 26)

## III. STANDARD

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff.  *See Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002).  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007) (hereinafter, "*Twombly*") (interpreting Fed. R. Civ. P. 8(a)) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (alteration in original) (citation omitted).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."  *Id.* at 1959.

## IV. DISCUSSION

### A. Breach of Contract

Under Delaware law, the elements of a breach of contract claim are:  (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting

---

[12]The Agreement provides for a thirty (30) day cure period for defaults, which has expired.  (D.I. 1 at ¶ 26)

damage to the plaintiffs. *WaveDivision Holdings, LLC v. Millennium Digital Media Systems, L.L.C.*, Civ. No. 2993-VCS, 2010 WL 3706624, \*13 (Del. Ch. 2010) (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)). Defendants' first argument is that plaintiffs' breach of contract claim (count one) should be dismissed because plaintiffs fail to identify any damages that they incurred as a result of defendants' alleged breach. (D.I. 21 at 5)  More specifically, defendants argue that plaintiffs have not alleged that the DEP has required plaintiffs to take any action with regard to the MBG stockpiles, only that **if** this occurs, they will be entitled to indemnification. (*Id.* at 6)  Therefore, the matter at bar is not ripe for adjudication.

The court disagrees that the contract claim is "based on speculative damages that rest entirely on some future possible action by the DEP." (D.I. 23 at 3)  As an initial matter, plaintiffs allege that two breaches have occurred:  false representations in violation of Article III of the Agreement; and a refusal to indemnify pursuant to Article VI of the Agreement. (D.I. 1 at ¶ 31)  The misrepresentations concern, for example, defendants' knowledge of the of MBG stockpiles[13] at the site (APA § 3.21(f)) and of the DEP's identification of the MBG stockpiles as "municipal waste" that must be remediated down (APA § 3.21(j)).[14]  (D.I. 1 at ¶¶ 11-19)  An "Environmental Claim" was defined "**without limitation**" to include the costs of "any investigation to determine whether Environmental Response is required."  (APA, Annex A-3) (emphasis added)  A

---

[13]Arguably a "substance" that is "regulated under **any** Environmental Law," per the Agreement's (broad) definition of Hazardous Substances.

[14]Arguably a "claim" or "demand" relating to an Environmental Law under the Agreement's (broad) definition of a Threatened Environmental Claim.

9

"Threatened Environmental Claim," therefore, is an even broader concept, conceivably
including the DEP's correspondence to defendants.

The relevance of this language is that defendants may have breached the
Agreement by failing to disclose the DEP's threatened action, regardless of whether the
DEP has (or may) require remediation. This breach arguably occurred commensurately
with one of plaintiffs' allegations of damages, that plaintiffs would have been able to
negotiate a lower sales price (than $58.75 million) taking into account the DEP's
requirements (D.I. 1 at ¶ 34), but prior to the accrual of plaintiffs' second alleged form of
damages, or the costs to bring the Northampton facility into compliance (alleged to
exceed $11 million ($52.50/ton x over 200,000 tons)) (*id.* at ¶ 25).[15]

Plaintiffs' claim for breach of the indemnification provisions of the Agreement
becomes ripe after liability for breach of the Agreement (by misrepresentation or
otherwise) has been established. *See LaPoint v. AmerisourceBergen Corp.*, 970 A.2d
185, 197-98 (Del. 2009) ("In a contract such as the Merger Agreement, in which one
party agrees to indemnify the other for damages, including attorneys' fees, arising from
that party's breach of the contract, the term 'indemnity' has a distinct legal meaning that
permits the party seeking indemnification to bring a separate cause of action for
indemnification after first bringing a successful action for breach of the contract.").

---

[15]Neither allegation is contained under the "count one" heading for breach of
contract; however, defendants cite no caselaw in support of their argument that the
damages allegation must be pled in a particular location in the complaint. (D.I. 23 at 4)
Rather, "[c]ourts have an obligation in matters before them to view the complaint as a
whole and to base rulings not upon the presence of mere words but, rather, upon the
presence of a factual situation which is or is nor justiciable" and "draw on the allegations
. . . in a realistic, rather than slavish, manner." *City of Pittsburgh v. West Penn Power
Co.*, 147 F.3d 256, 263 (3d Cir. 1998) (quotation omitted).

10

Thus, it is of no moment that plaintiffs have not yet paid to remediate the MBG

stockpiles. Plaintiffs have alleged a breach of the Agreement (violations of Article III)

with actual damages (an inflated purchase price) sufficient to withstand defendants'

motion to dismiss.[16] *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 n.28

(Del. Ch. 2003) (allegation of damages alleged in the form of an overpayment for an

investment sufficed).

## B. Fraud

To state a claim for fraud under Delaware law, plaintiffs must plead "with

particularity," Federal Rule of Civil Procedure 9(b), the following elements:

> (1) defendant's false representation, usually of fact; (2) made either with
> knowledge or belief or with reckless indifference to its falsity; (3) with an intent to
> induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction
> resulted from a reasonable reliance on the representation; and (5) reliance
> damaged the defendant.

*Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990). According to defendants, the

complaint does not satisfy Rule 9(b) as plaintiffs do not provide more than "threadbare

recitals of the elements of [their] cause of action," devoid of factual allegations

---

[16]The court makes no finding at this time on whether it will adjudicate the
indemnification issue contemporaneously. *See Breakaway Solutions, Inc. v. Morgan
Stanley & Co., Inc.*, Civ. No. 19522, 2004 WL 1949300, *15 (Del. Ch. Aug. 27, 2004)
(While indemnification claims generally do not accrue until the party seeking
indemnification has incurred the liability, "departure from this general rule may be
warranted where the interests of justice and judicial economy so dictate," such as
where the court has "all the information [needed] to adjudicate [the] demands for
indemnification") (citations omitted); *compare Daystar Const. Mgmt., Inc. v. Mitchell*,
Civ. No. 04C-05-175, 2006 WL 2053649, *11 (Del. Super. July 12, 2006) ("It is [ ] the
law of Delaware [ ] that if contribution or indemnification claims are brought as
derivative, cross or third-party claims, i.e., the claimant's right to indemnification or
contribution is contingent upon the success of the plaintiff's direct claim against him,
then the court may adjudicate all claims together in the interest of judicial economy.")
(citation omitted).

supporting the presence of justiciable reliance and damages. (D.I. 21 at 10-12 (citing *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (U.S. 2009)); D.I. 23 at 9)

While plaintiffs allege proximate cause generally (D.I. 1 at ¶ 35), they state that they relied on defendants' fraudulent representations (identified earlier in the complaint, *id.* at ¶¶ 11-18) and that if they "had been apprised of the regulatory status of the MBG, and the DEP's requirements in connection therewith, plaintiffs would have been able to negotiate a sales price taking into account DEP's stated requirements" (*id.* at ¶ 34). Plaintiffs thereby provide that defendants' misrepresentations (that the Northampton facility was free of encumbrances) caused them to overbid. The foregoing is a sufficient factual foundation with respect to reliance and, as discussed above, the court finds that plaintiffs have adequately pled damages.

The next issue presented by defendants' motion is whether Delaware law precludes plaintiffs' assertion of fraud (count two) separate from breach of contract, where the fraud is alleged to have occurred via material misrepresentations in the contract. "As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort. A breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or by alleging that the contracting parties never intended to perform." *Pinkert v. Oliveri*, Civ. No. 99-380-SLR, 2001 WL 641737, *5 (D. Del. May 24, 2001) (citations and internal quotations omitted).

The gravamen of plaintiffs' complaint in this case is that defendants had knowledge of the MBG stockpiles and the DEP concerns regarding them when

defendants executed the Agreement stating otherwise. Indeed, in its responsive papers to defendants' motion, plaintiffs do not point to any duties of defendants outside of those that arose under the Agreement. (D.I. 22 at 12-15) Plaintiffs assert that their fraud claim can coexist with their breach of contract action because defendants' fraud was intentional, and because the Agreement does not limit or eliminate tort remedies for knowingly false statements. (*Id.* at 12) In *Arby Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032 (Del. Ch. 2006), cited by plaintiffs, the Delaware Court of Chancery declined to dismiss a fraud claim in an action involving a stock purchase agreement. The unambiguous terms of that agreement provided: (1) a promise by the buyer that it was not relying on any warranties or representations not contained in the agreement; (2) that an indemnity claim was the exclusive remedy for any misrepresentations (to the exclusion of a rescission claim); and (3) the seller's liability for representations of fact was limited to a defined amount ($20 million). *Id.* at 1035. The Chancery Court decided that the public policy of this State would not "tolerate an attempt by a contracting party to immunize itself from a rescission claim premised on false representations of fact contained within a written contract and recognized by the parties to be the factual predicate for their decision to contract." *Id.* While the law permits sophisticated parties to draft contracts that insulate a seller from a rescission claim based on an unintentional misrepresentation of fact, "the contractual freedom to immunize a seller from liability for a false contractual statement of fact ends there." *Id.* If a buyer can demonstrate that a seller lied, or "acted with an illicit state of mind, in the sense that the seller knew that the representation was false and either communicated it to the buyer directly itself or knew that the company had," the buyer is free to press a

13

claim for full compensatory damages. *Id.* at 1036, 1064.

It is premature to adjudge, at this early stage, whether discovery may reveal that defendants committed intentional fraud, acting in more than a "reckless, grossly negligent, or negligent manner." *Id.* at 1064. The parties do not argue, and it is not self-evident from the complaint, that plaintiffs waived all rights to assert claims based on fraudulent conduct. The court will allow discovery to proceed and, consistent with the aforecited caselaw, resolve the issue on the summary judgment record. *See Roadsafe Traffic Systems, Inc. v. Ameriseal Northeast Florida, Inc.*, 705 F.Supp.2d 330, 334 (D. Del. 2010).

## C. Additional Fraud Claims and Permanent Injunction

In its count three, plaintiffs allege material fraud pursuant to UCC Chapter 5 and Section 5-109 of the Delaware UCC on the basis that defendants' presentment of the Note would be fraudulent insofar as plaintiffs' offset claim eliminates the Note's entire principal balance. (D.I. 1 at ¶ 37) In its count four, plaintiffs ask that the court issue a "temporary restraining order and a temporary and permanent injunction prohibiting Heller and THI from presenting the Greenstar Letter of Credit to Ulster Bank." (*Id.* at ¶ 42) Defendants move to dismiss both counts on the basis that the parties' September 2010 stipulation eliminated any potential UCC fraud claim and mooted plaintiffs' claim for injunctive relief. (D.I. 21 at 12-13) Specifically, the stipulation prohibits defendants from "present[ing] for honor or in any way attempt[ing] to draw upon the Ulster Letter of Credit or any substitute letter of credit plaintiffs may obtain . . . unless such presentation or draw is authorized by a further order of this court." (D.I. 17)

14

The court agrees that the stipulation eliminates any justiciable controversy between the parties on the basis of defendants' presentation of the Note.[17] *See, e.g., Surrick v. Killion*, 449 F.3d 520, 526 (3d Cir. 2006) ("Article III requires that an actual, live controversy be extant at all stages of review, not merely at the time the complaint is filed.") (citation and internal quotations omitted). In its responsive papers, plaintiffs voice concern that, if successful, an injunction must be in place when this action is concluded by a final judgment such that the Letter of Credit cannot be honored. (D.I. 22 at 15) Plaintiffs have separately requested a permanent injunction as a remedy in its complaint. (D.I. 1 at ¶¶ 62-63) The dismissal of plaintiffs' counts three and four does not, as plaintiffs assert, disrupt this court's authority to issue injunctive relief at the appropriate time.

## V. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted with respect to counts three and four and denied in all other respects. An appropriate order shall issue.

---

[17]To the extent the fraud claims were justiciable in the first instance, despite being drawn to only potential (and not actual) damage incurred. (D.I. 1 at ¶ 37 ("[p]laintiffs would be further damaged **if** THI presents the Letter of Credit. . . .") (emphasis added)

15