IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GREENSTAR, LLC and GREENSTAR ALLENTOWN, LLC f/k/a PENN ACQUISITION SUB, LLC, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civ. No. 10-746-SLR |
| TODD A. HELLER and TODD HELLER, INC., | ) ) ) ) |
| Defendants. | ) ) ) |
| TODD A. HELLER, TODD HELLER, INC., and TODD HELLER, INC. LIQUIDATING TRUST, | ) ) ) ) ) |
| Counterclaim-Plaintiffs, v. | ) ) ) ) |
| GREENSTAR, LLC and GREENSTAR ALLENTOWN, LLC f/k/a PENN ACQUISITION SUB, LLC, | ) ) ) ) |
| Counterclaim-Defendants. | ) ) |

Stephen C. Norman, Esquire, and John A. Sensing, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Plaintiffs and Counterclaim-Defendants.

William J. Wade, Esquire, and Elizabeth R. He, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware, and Laura D. Hatcher, Esquire of DLA Piper LLP, Wilmington, Delaware. Counsel for Defendants and Counterclaim-Plaintiffs.

**OPINION**

Dated: March 28 , 2013
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Greenstar, LLC and Greenstar Allentown, LLC f/k/a Penn Acquisition Sub, LLC ("Greenstar Allentown") (collectively, "Greenstar") filed this action on August 31, 2010 against Todd A. Heller ("Mr. Heller") and Todd Heller, Inc. ("THI") (collectively, "Heller") for allegedly failing to disclose information in connection with the sale of a Northampton, Pennsylvania recycling business ("the Facility"). (D.I. 1) Greenstar accuses Heller of breaching the underlying asset purchase agreement (the "Agreement") and making fraudulent misrepresentations regarding the Facility's liabilities, environmental condition, and compliance with laws and regulations that are related to certain stockpiles of glass on the Facility's premises. (*Id.*) Greenstar alleges that Heller's fraud and contract breaches have led directly to Greenstar incurring liabilities to remediate those stockpiles and now seeks to offset those damages against an $11.41 million promissory note ("the Note") that constituted part of the Agreement's purchase price. (*Id.*) Heller and the Todd Heller, Inc. Liquidating Trust ("the Heller Trust"), in turn, filed counterclaims on October 14, 2011, seeking declaratory judgment that they are entitled to collect the balance of the Note, with interest. (D.I. 26) The parties also seek attorney fees and costs pursuant to a fee-shifting provision in the Agreement. (D.I. 1; D.I. 26)

The court held a bench trial between September 24 and 26, 2012, and the parties have completed post-trial briefing. (D.I. 81, 82, 83) The court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332(a).[1] Having considered the documentary

---

[1]The parties have also consented, in the Agreement, to personal jurisdiction in Delaware. (JTX 16, § 7.8)

evidence and testimony, the court makes the following findings of fact and conclusions
of law pursuant to Fed. R. Civ. P. 52(a).

## II. FINDINGS OF FACT

### A. The Parties

1. Plaintiffs Greenstar, LLC and Greenstar Allentown are Delaware limited
liability companies. (D.I. 1 at ¶¶ 1, 2) The sole member of Greenstar Allentown is
Greenstar, LLC, whose sole member is Greenstar North America Holdings, Inc. (*Id.*)
Greenstar North America Holdings, Inc. is a Delaware corporation with its principal
place of business in Houston, Texas. (*Id.* at ¶ 1)

2. Defendant Mr. Heller is a citizen of the Commonwealth of Pennsylvania. (*Id.*
at ¶ 3) He serves as the president of THI, which is a Pennsylvania corporation with its
registered office in Allentown, Pennsylvania. (*Id.* at ¶ 4) The Heller Trust was created
on June 18, 2008, and Mr. Heller is the beneficiary of the Trust. (D.I. 26, counterclaims
at ¶ 3; D.I. 79 at 377:9-11)

### B. Background on Recycling and the Facility

3. In the early 1990s, Pennsylvania implemented mandatory recycling, whereby
communities over a certain size were required to recycle materials. (D.I. 79 at 384:8-
385:11) In a commingled, or single stream, collection system, individuals place all
recyclables, including paper products, glass, steel and aluminum cans, and plastics in
one recycling bin for collection. (D.I. 78 at 35:20-24, 194:7-20; D.I. 79 at 383:14-384:7,
386:15-25) With respect to glass, three primary colors of glass are recycled – green,
brown, and clear. (D.I. 79 at 253:13-17) Due to the commingled nature of collection,

2

as well as the process of picking up, transferring, and dumping recyclables, glass tends to break during collection. (*Id.* at 386:15-387:7) The material central to the dispute at hand is mixed broken glass ("MBG"), or glass that is both broken and not color-sorted.[2] (*Id.* at 443:2-9)

4. Heller owned and operated the Facility prior to selling it to Greenstar in September of 2007. (D.I. 78 at 36:23-37:4) In the late 1990s, Heller began accepting MBG at the Facility. (D.I. 79 at 387:8-11) The Facility was one of only a few businesses – if not the only one – in Pennsylvania that accepted MBG at the time. (*Id.* at 387:12-22) The only way Heller made money from any MBG it accepted was by turning around and selling it. (*Id.* at 388:15-21) At first, there was difficulty finding any market for MBG, and Heller simply collected and stored MBG, forming stockpiles (or "piles") of the material at the Facility. (*Id.* at 388:22-389:13, 390:6-23, 486:1-20; D.I. 78 at 184:23-185:6) Through collaboration with the Pennsylvania Department of Environmental Protection ("DEP"), the Department of Transportation, marketing groups, consulting groups, and others in the recycling industry, Heller was eventually able to develop a market for MBG starting in the early 2000s. (D.I. 79 at 389:14-24, 390:6-391:1, 391:23-392:1; JTX 4 at GSTH0018785) Some end uses for MBG include glassphalt, septic sand, fiberglass insulation, bottle manufacturing, flowable fill material, and pipe bedding. (D.I. 79 at 389:20-390:5, 391:2-11; JTX 2 at GSTH0023927; JTX 4 at GSTH0018785, GSTH0018787) The rate at which the Facility processed MBG changed over time, depending on the market for MBG. (D.I. 79 at 392:2-16)

---

[2]MBG is also known as "three mix" for the three colors of glass in it. (D.I. 79 at 253:13-17)

3

5. Heller received three grants from the DEP for over \$2 million to install glass processing equipment. (*Id.* at 392:22-393:2) One of the grants' conditions was that Heller had to process and recycle glass. (*Id.* at 393:3-393:20)

6. Today, the Facility conducts three types of recycling businesses: (1) a material recovery facility ("MRF"), which sorts single stream materials and processes them into their constituent grades; (2) a bead manufacturing plant, which grinds a certain quality glass in furnaces to make reflective glass beads for road projects; and (3) a glass sorting facility (the "glass plant"), which processes MBG (and certain contaminants contained in that glass) into a material called glass cullet that can be sold to glass mills to manufacture bottles. (D.I. 78 at 35:8-36:22) The MRF is the main business line of the Facility.

## C. Heller's Interactions with the DEP Prior to the Sale of the Facility

7. In 1999, the DEP visited the Facility and discussed "hopeful potential markets" for the on-site MBG with Heller. (D.I. 79 at 407:7-25, 486:20-22) At the time, the MBG was described as being in one stockpile, and Heller estimated the size of that stockpile to be 35,000 tons. (*Id.* at 490:23-491:12; JTX 2 at GSTH0023927)

8. On June 12, 2003, the DEP returned to the Facility to "determine the scope of the mixed broken glass material located at the site and determine generation and processing rates of the material, management of the piles and determine what markets Todd Heller had for the material." (JTX 2 at GSTH0023927; *see also* D.I 79 at 492:11-19) Christopher Fritz ("Fritz"), the DEP's recycling coordinator at the time, estimated that the size of the stockpile had tripled to over 100,000 tons. (JTX 2 at GSTH0023927;

4

D.I. 78 at 187:13-24)

9. On July 22, 2003, the DEP sent Heller a letter ("the DEP 2003 Letter") regarding its June 2003 visit. (JTX 3) The letter noted that the stockpiles had "at least doubled in size . . . ."[3] (*Id.* at GSTH0023937) The DEP stated that Heller needed to, inter alia, develop a written plan "to bring the stockpile into compliance with the Department's municipal waste regulations, Section 285.113 – Duration of Storage." (*Id.* at GSTH0023938) Section 285.113 of the DEP's regulations "requires that recyclable materials cannot be stored for periods longer than one (1) year unless the [DEP] approves in writing, a longer period based on a rate of recycling or resale of stored waste that is reasonably proportional to the rate of accumulation for storage." (*Id.* at GSTH0023937)

10. William Tomayko ("Tomayko"), the program manager for the DEP's waste management program, testified that Heller was not out of compliance with § 285.113, but that the DEP "want[ed] to understand how he intend[ed] to comply with . . . the regulations." (D.I. 78 at 219:16-25) Because § 285.113 provides various exceptions to the regulation that an operator of a recycling facility cannot store materials for longer than one year, the DEP was trying to determine whether or not there was a violation of § 285.113.[4] (*Id.* at 220:7-221:2)

11. The DEP, seeking more information, requested that Heller provide the

---

[3]Although the amount of MBG on-site apparently increased significantly, it is unclear how the stockpiled MBG appeared at the time. (*See* JTX 3)

[4]The DEP did not make a determination at the time as to whether or not MBG was "waste," as such a determination depends on whether the MBG would be processed for recycling or simply discarded. (D.I. 78 at 196:24-197:6)

following within 60 days from the receipt of the letter:

> 1. An updated amount (in tons) of unprocessed [MBG] currently stockpiled onsite.
> 2. An accurate site drawing identifying the locations of all stockpiles of glass, including unprocessed and processed color sorted glass, and processed or unprocessed mixed broken glass . . . .
>
> . . . .
>
> 4. A written procedure and system to accurately record and track, by weight, the daily quantities of [MBG] generated, stored, and processed (for resale) onsite.
> 5. . . . [A]n assessment and strategy for processing and marketing [MBG] in the future.
> 6. A plan that provides for the rate of removal, marketing or disposal, and expected timeframe to remove the waste contaminants and reduce the size of the unprocessed MBG stockpile to one that accumulates no more than the amount of [MBG] generated within one (1) year to comply with the regulations.

(JTX 3 at GSTH0023938)

12. Heller responded to the DEP 2003 Letter on September 15, 2003 ("Heller's

2003 Response"), stating that the Facility was generating approximately 75 tons of

MBG per day from the MRF, or 19,500 tons per year. (JTX 4 at GSTH0018786; see

also JTX 5 at GSTH0000185) Heller also estimated that there was approximately

135,000 tons of unprocessed MBG on site and identified several applications for MBG

that Heller was exploring with potential customers. (JTX 4 at GSTH0018786) Heller

asked the DEP to keep the information contained in the letter confidential out of a

concern that,

> if other processors try to produce a product that [Heller] ha[s] spent a long time developing for these markets, it will be done without using the proper process and equipment, therefore, not meeting the "spec" of the respective market places. Should that happen, these products would fail in their application and the crushed glass would be "given a black eye."

(Id. at GSTH0018785)

13. Although Heller did not provide the DEP with a marketing plan or any written

6

procedure to track and record daily quantities of MBG generated, stored, processed, and marketed, it did commit to processing 200 tons of MBG daily – 125 tons from the stockpiles and 75 tons from the MBG generated from the MRF. (*Id.* at GSTH0018787; D.I. 78 at 233:4-17; JTX 4 at GSTH0018787; *see also* JTX 5 at GSTH0000186) Heller promised the DEP that "we will not add one more pound of the mixed glass to the three mixed piles." (JTX 4 at GSTH0018787)

14. David Elm ("Elm") of the DEP conducted follow-up "inspections" of the Facility on April 19, 2004 and April 20, 2005. (*See* JTX 7) His report from the latter inspection noted that he was "unable to determine a significant difference in the size of the [MBG] stockpiles" since April 19, 2004. (*Id.* at GSTH0023943)

15. In response to a DEP request, Heller also began submitting reports to the DEP in August 2004 regarding the unprocessed MBG that was on site. (PTX 5; D.I. 79 at 415:21-24) The reports were submitted on a monthly basis and consisted of "approximately how much time was spent processing the three mixed, how much glass was processed and the type of product made." (PTX 5 at GSTH0018626) Between August 2004 and August 2007, Heller sent 28 such reports (the "monthly reports") to the DEP. (*See* PTX 5-16, 18-29, 32-33, 49, 52) Heller's final monthly report was sent to the DEP on August 13, 2007, approximately 3 weeks before Heller sold the Facility to Greenstar. (PTX 52) According to Heller's monthly reports, it processed approximately 65,000-70,000 tons of MBG and sold approximately 35,000 tons of the glass contained in the stockpiles between August 2004 and August 2007. (*See* PTX 5-16, 18-29, 32-33, 49, 52) As Tomayko testifies, it is not clear that Heller fulfilled its commitment to

7

process 200 tons of MBG daily and, in any case, the stockpiles remained:

> **Question:** Did Mr. Heller honor that commitment to remove 200 tons of MBG daily?
> **Answer:** I think he supplied us with some records for a period of time about processing. Whether or not it was living up to the 200 tons, I don't know. I can say that, I guess I will say it bluntly, nobody has performed.
> **Question:** So Mr. Heller did not live up to that commitment to process and remove?
> **Answer:** The piles are still there.

(D.I. 78 at 233:18-234:2)

16. Nevertheless, the DEP did not take any action against Heller – it did not issue any notice of violation, enter into any consent order, issue any fine, or even threaten any investigation or review. (D.I. 79 at 284:2-10) A 2003 internal email sent by Fritz (the "2003 internal DEP email") recommended and considered further action, such as conducting a survey of the MBG stockpiles, requiring Heller to weigh the MBG during processing, or "entering into a consent order & agreement to require the reduction of the amount of contaminated, unprocessed MBG stored on-site." (JTX 5) However, the DEP did not ultimately follow through with any of those considerations.

17. As Heller asserts, the DEP was primarily concerned with **unprocessed** MBG stockpiled at the Facility, even though it does mention processed and color-sorted glass in its correspondence. The DEP 2003 Letter asked for an estimate of the amount of **unprocessed** MBG on site and requested a plan for the rate of removal, marketing or disposal of the **unprocessed** MBG. (JTX 3 at GSTH0023937-38) This focus is confirmed by the 2003 internal DEP email that referred almost exclusively to unprocessed MBG and referenced Heller's commitment to manage "the unprocessed stockpile." (JTX 5) Similarly, Heller's estimate that 135,000 tons of MBG remained on

8

site in 2003 referred to unprocessed MBG. (JTX 4 at GSTH0018786) The term "processing" is used in various ways in the documentation and in the trial testimony. How MBG is processed (e.g., sorted by color or size) depends on its intended end use in the market but, in all cases, the goal of "processing" MBG is to make it marketable. For example, Heller's 2003 Response described how the Facility sometimes "processes" MBG and then stores it "**so [that] it is available for [customers] when they need it**." (*Id.* at GSTH0018787) (emphasis added) Similarly, Tomayko testified that "processing" means "[e]xcavating or taking the glass, putting it through equipment so that the glass could be segregated, and **for the purpose of marketing the glass**." (D.I. 78 at 191:21-25) (emphasis added) Accordingly, "unprocessed" MBG refers to glass that is not sorted or segregated for its intended use, i.e., not sorted by color or size. This definition of "unprocessed" is consistent with the DEP correspondence and descriptions of surveyed stockpiles in the documentation. (*See* JTX 3, 4, 5; DTX 33 at GSTH0021101)

18. Both the documentary evidence and trial testimony indicate that the DEP was ultimately interested in the removal, not just the processing, of the unprocessed MBG. The DEP 2003 Letter requested "[a] plan that provides for the rate of **removal, marketing or disposal**, and the expected timeframe to **remove** the waste contaminants and reduce the size of the unprocessed MBG stockpile . . . ." and was concerned with the "**storage and quantities** of mixed broken glass" at the Facility. (JTX 3 at GSTH0023938) (emphasis added) Heller also understood that the DEP sought the removal of the unprocessed MBG. For example, Heller's 2003 Response to

9

the DEP stated: "Please be assured that [we are] aware of the urgency in **eliminating** the pile of three mixed. Our plan is to continue to process the material and freight it to the various markets to complete the loop of recycling glass." (JTX 4 at GSTH0018787) (emphasis added) Tomayko's testimony also confirms that the DEP maintained a consistent desire for the MBG stockpiles to be removed from the Facility. (D.I. 78 at 186:9-13, 202:2-6, 208:17-20, 215:6-8, 216:5-6)

### D. Sale of the Facility to Greenstar

#### 1. Greenstar's knowledge of conditions at the facility at the time of the Agreement's closing

19. On August 1, 2007, just prior to the Agreement's closing, Maurer & Scott Sales Inc. issued a survey (the "2007 Survey") of 14 glass piles located at the Facility, assigning each specific pile a number.[5] (JTX 15) Of the 14 stockpiles identified in the 2007 Survey, Greenstar asserts that Heller is liable for the costs associated with removing 11 of them: Piles 53, 56, 60, 63, 66, 70, 73, 76, 80, 83, and 90. These piles totaled 102,033 cubic yards. (*Id.* at HELLER00005637) Pile 90, the largest pile, contained 44,240 cubic yards of unprocessed MBG at the time. (*Id.* at HELLER00005637) The 2007 Survey did not provide the estimated tonnage of these piles.

#### 2. The Agreement

20. On September 4, 2007 (the "Closing Date"), Heller and Greenstar entered into the Agreement, by which Greenstar agreed to purchase the Facility for $58.75

---

[5]There was a fifteenth pile that could not be surveyed because of vegetation. (JTX 15 at HELLER00005637)

10

million.[6]  (JTX 16, § 2.1)  Greenstar agreed to pay a portion of the purchase price
pursuant to the Note in the amount of $11.41 million, secured by a letter of credit.  (*Id.*)

21.  Article III of the Agreement sets forth several representations and warranties
made by Heller as of the closing date.  (*Id.*, §§ 3.1-3.26)  Greenstar's breach of contract
claims focus on four of those representations and warranties:  § 3.21(k) regarding
environmental matters; § 3.17 regarding compliance with laws and contracts;  § 3.7
regarding the absence of undisclosed liabilities; and § 3.26 regarding disclosures.

22.  The Agreement also has an "Excluded Liabilities" provision:  "Except for the
Assumed Liabilities,[7] the Buyer shall not assume or be responsible for any claims
against, or Liabilities, commitments, contracts, agreements or obligations whatsoever of
any Seller Party,[8] including without Limitation," certain "Excluded Liabilities."  In a
separate contract (the "inventory contract"), Greenstar purchased all of THI's inventory
and similarly "assume[d] no Liabilities whatsoever of any Selling Party incident thereto."
(DTX 10 at GSTH0000894; *see also* D.I. 78 at 141:1-7)  Article VI provides Heller's
indemnification obligations.  (JTX 16, Art. VI)  Greenstar and Heller also agreed to a
fee-shifting provision whereby the non-prevailing party in litigation shall pay the costs of
the prevailing party, including attorney fees.  (*Id.*, § 7.12)

## 3. Heller's representations to Greenstar

_____

[6]Although Greenstar purchased the Facility pursuant to the Agreement, Heller
still owns the land on which the Facility is located, and Greenstar operates the Facility
under a September 4, 2007 lease agreement entered into with Heller.

[7]None of the Assumed Liabilities relate to the MBG stockpiles. (*See* JTX 17,
Schedule 1.3)

[8]The "Seller Parties" were THI and Mr. Heller.  (JTX 16 at HELLER00004911)

11

23. On June 27, 2007, during the negotiation of the sale of the Facility, Cardinal Consulting Group ("Cardinal"), an environmental consulting group, issued a Phase I environmental report ("Phase I Report") to identify historic, existing, or suspected recognized environmental conditions ("RECs"). (See PTX 48 at GSTH0032951) The Phase I Report stated that "Cardinal performed a review of pertinent files stored at the Northeast Regional Office of the [DEP] as part of th[e] assessment." (Id. at GSTH0032967) Although the report mentioned three files related to the Facility, Cardinal "was not provided with, nor did [it] obtain, prior environmental reports or other documentation for the Property during the investigative process." (Id.) Cardinal discussed documents with Mr. Heller as well, but Mr. Heller did not mention any correspondence with the DEP regarding the MBG stockpiles. (Id. at GSTH0032967; D.I. 80 at 555:10-13, 555:22-24, 556:5-22) According to a summary of the interview, Heller stated that he was unaware of any "significant recognized environmental concerns, potential RECs, historical RECs or other concerns with the Property." (PTX 48 at GSTH0032988)

24. There is no dispute that Heller did not disclose (1) the existence of the DEP 2003 Letter; (2) Heller's 2003 Response to the DEP; (3) the site visits conducted by the DEP regarding the stockpiles; and (4) the existence of the monthly reports sent to the DEP. (D.I. 79 at 444:20-446:2) At the same time, there is no dispute that Greenstar was aware of the stockpiles' existence prior to the closing of the Agreement. (See D.I. 81 at 2)

**E. Greenstar's Upgrade to the Facility's Glass Plant**

12

25. After acquiring the Facility, Greenstar employed Mr. Heller as president and general manager of the Facility. (D.I. 78 at 33:5-8; D.I. 80 at 559:18-25) The general manager had "general responsibilities for a business operation," including responsibilities for the performance of the Facility. (D.I. 78 at 33:9-19) In June 2008, Greenstar retained Richard Smith ("Smith") to replace Mr. Heller as general manager of the Facility, and Mr. Heller was assigned to be the project manager for an upgrade to the Facility's glass plant.[9] (*Id.* at 33:25-34:14, 43:23-44:1; D.I. 79 at 251:2-12, 447:12-25; D.I. 80 at 559:18-22)

26. Greenstar wanted to upgrade the glass plant in order to obtain commercial ability to sort MBG by color; potentially receive MBG from other producers in the region; and deal with the MBG that was on site. (D.I. 78 at 42:5-16; D.I. 79 at 307:11-18) According to a proposal for the upgrade, presented by Greenstar management to its parent company and dated August 5, 2008, one strategic rationale for "invest[ing] in a world class glass processing plant" was to "[f]ollow through on the business plan and milestones presented in the THI acquisition [Board of Directors] paper including clean up of the 150,000 tons of on-site glass by August 2010." (DTX 15 at GSTH0009181) The Board of Directors paper referenced was an executive summary document to obtain permission for the acquisition of the Facility. (D.I. 78 at 146:24-147:23) Therefore, at the time of the Agreement's closing, Greenstar had in place a "business plan and milestones" to "clean up" all of the glass that was then on site – the upgrade to the glass plant was undertaken, at least in part, to remove the MBG stockpiles. (DTX

---

[9]Mr. Heller subsequently left Greenstar in the spring of 2009. (D.I. 78 at 33:22-24)

13

15 at GSTH0009181; D.I. 78 at 141:9-16, 147:18-148:2; D.I. 79 at 307:17-21)
According to Steve Dunn ("Dunn"), who joined Greenstar in November 2007 as
Regional Vice President, Greenstar "always had a plan to deal with the MBG
stockpiles." (D.I. 78 at 144:16-19)

27. The upgrade to the Facility's glass plant began around the fall of 2008 and
was completed in the spring of 2009. (*Id.* at 43:21-22) It cost around $8 million. (DTX
15 at GSTH0009181; JTX 22 at GSTH0010494; D.I. 79 at 307:19-21)

### F. Greenstar's Interactions with the DEP

28. Following its acquisition of the Facility, Greenstar had three on-site meetings
with the DEP in which the MBG stockpiles were discussed. (D.I. 79 at 255:3-7) The
first meeting took place in September 2008. (*Id.* at 255:8-10, 256:5-12; PTX 53 at
GSTH0018659) At this meeting, three DEP representatives, including Fritz, introduced
themselves to Smith and inquired how Greenstar planned on removing the MBG
stockpiles. (*Id.* at 254:22-255:2, 255:11-15, 255:20-24, 256:5-12; PTX 53 at
GSTH0018659) Greenstar responded by informing the DEP that it was investing in
new technology – the upgrade to the glass plant – that could optically sort glass by
color and remove contaminants. (D.I. 78 at 190:19-25, 191:11-20; D.I. 79 at 255:25-
256:4; PTX 53 at GSTH0018659) Smith testified that, because he "did not know there
was any issues [sic] with glass on the site," he was "surprised" at the DEP's "interest[] in
seeing how Greenstar was going to handle the large piles of [MBG]." (D.I. 79 at
388:22-389:11)

29. In January 2009, the DEP made a second site visit to discuss general plans

14

for the Facility. (D.I. 78 at 45:1-12) The MBG stockpiles were also discussed at this meeting.[10] (*Id.* at 44:12-22, 48:11-15) In an internal DEP correspondence following the site visit, the DEP expressed concern that the Facility was "accepting **significantly more volume of materials than is being processed, marketed, and recycled." (JTX 18 at GSTH0023952)

30. In April or May of 2009, Greenstar, represented by Smith and Dunn, met a third time with the DEP, represented by Tomayko and Fritz – this time to specifically discuss the stockpiles. (D.I. 78 at 50:21-51:7, 142:1-4, 202:7-15) Greenstar provided an update regarding the stockpiles, and the participants discussed the DEP's "concerns about the size of the piles, the number of piles on the property, the lack of processing of the glass, and, again, Greenstar's intentions for either removing the glass piles or processing the glass piles for its removal and marketing." (*Id.* at 51:8-13, 202:16-202:22) There was also discussion of DEP's desire for "a schedule for the removal of the piles" and "a need to have a survey done to determine the size of the piles." (*Id.* at 202:22-203:1)

31. In response to the DEP's requests at the April/May 2009 meeting, Smith sent Tomayko a letter on July 15, 2009, estimating the size of the stockpiles and proposing a schedule for their processing and removal. (JTX 22; D.I. 78 at 52:6-13, 202:22-25, 203:13-18) Smith estimated that, as of July 15, 2009, the MBG stockpiles had grown to approximately 210,000 tons, divided into three general piles - Areas 1, 2

---

[10]This was the first meeting at which Tomayko was present. (D.I. 78 at 44:18-25)

15

and 3.[11]  These Areas were not categorized as containing processed or unprocessed

MBG, and Greenstar committed to removing all of the glass in those Areas. Smith

estimated that Areas 1 and 2 would be eliminated in 16 months and that Area 3 would

be eliminated in 14 months. (JTX 22 at GSTH0010495)

32. As with Heller, the DEP never imposed any formal sanctions on Greenstar –

it never issued any notice of violation to Greenstar, asked Greenstar to enter into any

consent order, or fined Greenstar with respect to the MBG stockpiles. (D.I. 78 at

142:24-143:12) Nor did the DEP open or threaten an investigation or review into

Greenstar's management of the MBG. For example, Dunn declined to characterize the

DEP's correspondence with Greenstar as constituting a "proceeding;" rather, he only

went so far as to testify that the DEP was "certainly interested in" the MBG stockpiles.

(*Id.* at 143:13-24; *see also id.* at 201:22-202:6) The DEP, at some point, considered

entering into a consent order with Greenstar but ultimately did not, given Greenstar's

intentions to process and remove the MBG. (*Id.* at 197:22-198:12) Despite the DEP's

failure to take formal action, it remains concerned, to this day, about the MBG

---

[11]Greenstar groups the MBG stockpiles into 3 piles, which the court will refer to
as the 3 "Areas" of MBG. (*See* JTX 22 at GSTH0010494-96) A drawing by Dunn also
identifies 3 Areas of MBG, though it differs from JTX 22 by swapping the numbering of
Areas 1 and 2. (*Compare* PTX 86 *with* JTX 22 at GSTH0010494-96; *see also* D.I. 78 at
38:4-39:20) The court will refer to the 3 Areas consistent with JTX 22. Area 1, located
east of the glass plant, corresponds to Pile 90 on the 2007 Survey; Area 2, located
behind the MRF, corresponds to Piles 60, 63, 66, and 70; and Area 3, located
northwest of the Facility's office, corresponds to Piles 53 and 56. (D.I. 81 at 16 n.18;
*compare* JTX 22 at GSTH0010496 *with* JTX 15 at HELLER00005652) Greenstar does
not seek recovery for Piles 40, 43, and 50. (D.I. 81 at 13 n.17)

stockpiles.[12]  (*Id.* at 231:9-18)

## G. Greenstar's Management of the Stockpiles

33.  In April 2009, Greenstar began operating its upgraded glass plant and processed the MBG in Area 2 first. (*Id.* at 63:1-4, 160:7-9)  Between April 2009 and July 2010, Greenstar processed 77,195 tons of the stockpiles. (*Id.* at 65:5-8; DTX 51; PTX 74 at GSTH0024055)

34.  Because of the weathering and age of the stockpiled MBG left by Heller (the "historical MBG"),[13] yield quality, or the actual amount of colored glass that could be produced through the plant, was much less than expected – 52.2% recovery compared to projections of over 85%. (DTX 35 at GSTH0011471072; D.I. 78 at 61:20-62:9) Processing the stockpiles also caused jamming problems in the glass plant. (DTX 35 at GSTH0011471-72; D.I. 78 at 61:20-62:9)  In contrast, the glass being generated from the MRF had a larger general particle size and was "fresher" than the historical MBG in the stockpiles being processed and, thus, had a better yield.  (D.I. 78 at 66:15-67:4)

35.  Greenstar claims that, because it was processing the historical MBG, it was

---

[12]For instance, Tomayko testified:

**Answer:** I can tell you that to this day, we still have a large stockpile of glass at this property. So I am still not satisfied. . . . [W]e've had a lot of representations over the years about processing this glass, and nobody's actually, to me, performed.
**Question:** So the Department is not satisfied?
**Answer:** I am not satisfied, yeah.  Glass piles still exist.  They should not be.

(D.I. 78 at 231:9-18)

[13]The term "historical MBG" does not distinguish between processed and unprocessed MBG.

17

unable to use its upgraded glass plant to process much of the MBG that was being generated by the MRF, and the majority of the MRF-generated glass was deposited in Area 3. (*Id.* at 65:18-66:2, 179:11-180:10) Greenstar had to forego processing 65,048 tons of MBG generated from the MRF due to the processing of the historical MBG. (*Id.* at 65:18-66:14; PTX 74)

36. In light of the difficulties with processing the historical MBG, Greenstar began looking for alternative disposal methods in the summer of 2009. (D.I. 78 at 60:9-61:5) In November 2009, Dunn and Smith traveled to the DEP's offices to meet with Tomayko and Fritz and ask for guidance regarding alternatives to processing, including quarry and clean-up projects. (*Id.* at 61:12-19; D.I. 79 at 263:5-12) Although the DEP was open to alternatives to processing, it still requested that the stockpiles be removed from the Facility. (D.I. 78 at 62:10-19, 206:12-23)

## H. Greenstar Learns of the DEP's Prior Investigation of the Stockpiles

37. After running into difficulties with processing the historical MBG, Greenstar decided to review the DEP's files. (*Id.* at 67:20-68:8) On May 5, 2010, Dunn sent the DEP a "Request to Review Files," after which Dunn and Smith traveled to the DEP's offices to review the files. (PTX 59; D.I. 78 at 69:10-11; D.I. 79 at 264:25-265:2) That was the first time that Greenstar learned of the DEP's interest in the stockpiles under Heller's ownership of the Facility and the related correspondence between the DEP and Heller.[14] (D.I. 78 at 70:1-15, 71:24-72:5; D.I. 79 at 265:12-266:9; *see also* PTX 60)

---

[14]Tomayko could not confirm whether or not the correspondence between Heller and the DEP was actually kept confidential. (*See* D.I. 78 at 236:236:15-237:1) However, given that (1) the Cardinal report reviewed the DEP files and did not mention the correspondence and (2) the lack of any evidence to the contrary, the court finds no

38. In a letter dated July 23, 2010, Greenstar provided notice to Heller of its indemnity claim and the alleged DEP proceeding. (PTX 61; D.I. 78 at 77:17-78:9) The parties, however, have been unable to resolve Greenstar's claims. (See PTX 65; D.I. 78 at 78:13-80:13)

39. On July 28, 2010, Greenstar stopped processing the stockpiles through the glass plant, purportedly because it was "dealing with the historical glass to the detriment of dealing with [its] own glass out of the MRF operation," and it could not "market the glass that came out." (D.I. 78 at 67:8-16; D.I. 79 at 266:16-18, 306:24-307:7) Meanwhile, the DEP continued to be concerned that Greenstar was taking in more glass than it was eliminating. (D.I. 78 at 52:14-23, 142:7-14; JTX 22 at GSTH0010494; see also JTX 18)

40. In July 2011, Greenstar sold the glass plant to CAP Glass Allentown, LLC ("CAP"). (PTX 71) The Purchase Agreement allows CAP to take for processing any of the stockpiles at the Facility, at no cost to CAP. (Id., § 8; D.I. 78 at 126:9-23) After testing the glass from the stockpiles, however, CAP concluded that the glass had no value or use for CAP and could not be run through a color sort plant to be recycled. (PTX 84) CAP does not intend to take any of the stockpiles for processing. (Id.; D.I. 78 at 127:4-7)

## I. Greenstar Contracts with Coplay to Remove the Stockpiles

41. On October 10, 2011, after filing the instant suit, Greenstar and Coplay Aggregates, Inc. ("Coplay") entered into a contract for the removal of 350,000 tons of

---

reason to doubt that the information was kept confidential and that Greenstar did not learn about it until May 2010.

MBG from the Facility at $9.15 per ton. (PTX 75; D.I. 79 at 266:25-267:17) Coplay

obtained DEP approval to put certain MBG into its quarry. (D.I. 79 at 266:19-24) On

top of the contract price with Coplay, Greenstar asserts that it also pays for fuel, scale

usage, and screening costs, which bring the total cost of removal to an estimated $12

per ton. (Id. at 267:18-268:12; PTX 76)

42. Between October 15, 2011 and March 22, 2012, Coplay removed around

110,000 tons of glass, at a cost to Greenstar of $1.01 million dollars. (PTX 77)

Between June and August 2012, Coplay removed another 9,400 tons of glass. (PTX

81) As of August 16, 2012, Greenstar had paid $1,102,907.70 to Coplay for glass

removal. (D.I. 79 at 273:16-274:4, 274:22-275:4; PTX 85)

43. As of the time of trial, the MBG stockpiles had still not been entirely removed

from the Facility; Greenstar was making the glass to Coplay's specifications (but not

processing it through the glass plant), and Coplay was then removing the glass from the

Facility. (D.I. 79 at 266:10-18, 272:12-13, 273:13-15)

## III. CONCLUSIONS OF LAW

44. Greenstar alleges that Heller "deliberately and intentionally" failed to inform

Greenstar that

(1) in 1999, the DEP had conducted a site visit because Heller had been
stockpiling [MBG] for years, rather than recycling it as required; (2) in July
2003, the DEP had informed Heller that the Stockpiles were not in
compliance with Pennsylvania law; (3) the DEP had been investigating the
Stockpiles and seeking their elimination, and had required Heller to
provide a plan for their elimination; (4) the DEP had required Heller to
submit monthly reports regarding progress on the processing and removal
of the Stockpiles; and (5) Heller failed to comply with the DEP's directives
and failed to bring the Stockpiles into compliance with Pennsylvania law.

(D.I. 81 at 2) Greenstar asserts causes of actions for various breaches of the

20

Agreement and for fraud, which the court will address in turn. Heller asserts that
Greenstar fails to establish any of its claims and that the lawsuit is simply the result of
buyer's remorse.[15] (*Id.* at 1) The court does not agree with some of Greenstar's
characterizations of the correspondence between Heller and the DEP[16] and does not
find that Greenstar has proven its claim for fraud. However, the court concludes that
Heller did breach several provisions of the Agreement and that Greenstar has
established certain damages related to those breaches.[17]

## A. Breach of Contract

45. Greenstar contends that, under the plain meaning of Article III's
unambiguous terms, Heller breached the representations and warranties contained in
§§ 3.21(k), 3.17, 3.7, and 3.26 of the Agreement. (*Id.* at 21-32) It also asserts that
Heller breached the Agreement by refusing to indemnify Greenstar pursuant to Article
VI of the Agreement. Heller asserts that it provided true and accurate disclosures and
that Greenstar is not entitled to indemnification. (D.I. 79 at 434:16-18)

46. Under Delaware law, a claim for breach of contract requires: (1) a
contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting
damage to the plaintiffs. *WaveDivision Holdings, LLC v. Millennium Digital Media Sys.,*

---

[15]The court declines to address Heller's estoppel defense, as it was asserted for
the first time in Heller's post-trial briefing and was not supported by any citations to the
record. (*See* D.I. 82 at 39-40)

[16]For example, the DEP did not find that the stockpiles were in violation of any
law and did not open an "investigation."

[17]The court also finds that the stockpiles gave rise to Excluded Liabilities as
defined in the Agreement.

*LLC*, Civ. No. 2993, 2010 WL 3706624, at \*13 (Del. Ch. 2010) (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003)). A plaintiff must prove these elements by a preponderance of the evidence. *Tani v. FPL/Next Era Energy*, 811 F. Supp. 2d 1004, 1023 (D. Del. 2011).

47. In Delaware, the interpretation of contracts is a matter of law for the court to determine. *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.1992). A court's interpretation of a contract "will give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del.2012) (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours and Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) (citations omitted). If a contract's terms are clear and unambiguous, the court will interpret such terms according to their ordinary and usual meaning. *See Paul*, 974 A.2d at 145. Contract terms are held to be clear and unambiguous "when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (citing *Rhone-Poulenc*, 616 A.2d at 1196). "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different

meanings." *Rhone-Poulenc*, 616 A.2d at 1195.

48. The court finds that the provisions of the Agreement at issue are clear and unambiguous, and Heller had broad contractual obligations under them. Because Heller concedes that it did not disclose documentation and correspondence regarding the MBG stockpiles, the issue of breach rests on whether an issue that has never led to formal sanctions can be considered an "Environmental Matter," an actual or potential violation of a "Legal Requirement," or an undisclosed "Liability," under the terms of the Agreement. For the reasons below, the court finds that Heller breached §§ 3.17, 3.7, and 3.26 of the Agreement, but not § 3.21(k).

## 1. Provisions at issue

### a. Agreement § 3.21(k) – "Environmental Matters"

49. Greenstar alleges that Heller breached § 3.21(k) by not providing Greenstar with copies of certain documents related to environmental issues, namely the DEP 2003 Letter, Heller's 2003 Response, and Heller's monthly reports to the DEP. Section 3.21(k) provides:

### 3.21 **Environmental Matters.**

. . . .
(k) The Seller[18] has provided the Buyer[19] with copies of all reports, assessments, inspections, investigations, correspondence (internal and external), analytical data and other documents and records relating to the environmental condition of the Seller or the Business Facilities, their compliance with Environmental Laws, and/or Environmental Claims.

(JTX 16, § 3.21(k))

---

[18]The "Seller" was THI. (JTX 16 at HELLER00004911)

[19]The "Buyer" was Greenstar Allentown. (JTX 16 at HELLER00004911)

23

50. The court agrees with Greenstar's assertion that the plain meaning of § 3.21(k)'s terms requires the disclosure of all documents and records related to environmental conditions, compliance with Environmental Laws, and Environmental Claims (collectively, "environmental issues"). (D.I. 81 at 22) The Agreement explicitly and unambiguously defines "Environmental Laws" and "Environmental Claims" in Annex A. An Environmental Law must relate to, inter alia, "health, the environment, . . . or the emission, discharge, release, treatment, storage, disposal, distribution or management of, or exposure or response to, Hazardous Substances." (JTX 16, Annex A-4) Contrary to Heller's assertion (see D.I. 80 at 564:24-565:1), the plain meaning of this definition does not limit Environmental Laws to rules or regulations related to Hazardous Substances.[20] Rather, Environmental Laws include, more generally, rules or regulations pertaining to health or the environment. Meanwhile, the Agreement's definition of "Environmental Claims" includes any claim, demand, action, cost, expense, or damage related to "(i) any violation, potential violation of, actual or potential liability under, or noncompliance with, any Environmental Law . . . [;] any Loss incurred in

---

[20]"Hazardous Substances," in turn, are defined in the Agreement to mean:

(i) substances, materials, or wastes that are or become classified or regulated under any applicable Environmental Law; (ii) those substances, materials, or wastes included within statutory and/or regulatory definitions or listings of "hazardous substance," "special waste" "hazardous waste," ["]extremely hazardous substance," "solid waste" "medial waste," "regulated substance," "hazardous materials," "toxic substances," or "air contaminant" under any Environmental Law; and/or (iii) any substance, material, or waste which is or contains: (A) petroleum, oil or any fraction thereof, (B) explosives, or (C) radioactive materials (including naturally occurring radioactive materials).

(JTX 16, Annex A-5)

24

connection with any investigation to determine whether Environmental Response is
required or for breach or violation of any requirements of Environmental Laws; . . . and
any claim based upon any asserted or actual breach or violation of any Environmental
Permit or Environmental Law." (JTX 16, Annex A-3)  Therefore, an Environmental
Claim must be premised on a violation, potential violation, or potential liability.

51.  As discussed above, the DEP has never issued any formal sanction or
violation related to the MBG stockpiles.  Greenstar alleges an Environmental Claim was
implicated to the extent that the MBG was a **potential** violation of or **potential** liability
under an Environmental Law.  (D.I. 83 at 5)  However, Greenstar has not carried its
burden of showing that the withheld documents and records relate to any environmental
issue, even a potential one.  The only regulation underlying Greenstar's argument is
§ 285.113 of the DEP's regulations, which relates to the "duration of storage" for
waste.[21]  Greenstar proffers that § 285.113 is a regulation related to "health" or the
"environment."[22]  (See D.I. 81 at 24; D.I. 83 at 4-5)  Beyond this bald assertion, there is
no evidence that § 285.113 is an Environmental Law.

52.  Instead, the court finds testimony that the MBG stockpiles did not pose any
environmental concern or represent an environmental condition to be convincing.
Tomayko – program manager of the DEP's waste management program and the only
DEP employee whose testimony was offered at trial – testified that MBG is "generally

---

[21]The parties do not contest that the DEP is a "Governmental Authority," as
defined in the Agreement, or that § 285.113 is a rule or regulation by a Government
Authority.

[22]Greenstar does not argue that § 285.113 regulates Hazardous Substances.

inert, meaning that it's not having an environmental impact. It's not blowing in the wind.
It's not causing any problems." (D.I. 78 at 243:21-244:1) Rather, the MBG stockpiles
were only a public nuisance as an "eyesore," and the DEP made a resource-conscious
decision to prioritize more problematic environmental and pollution violations over "less
important" concerns like the MBG stockpiles. (*Id.* at 244:1-244:15) The evidence
indicates that the MBG stockpiles, alone, do not constitute an environmental issue.[23]

53. In other words, even if Heller's failure to remove unprocessed MBG at a
certain rate gave rise to potential violation of or liability under § 285.113 – an issue the
court need not address – Greenstar has not shown, in the first instance, that § 285.113
is an Environmental Law, as defined by the parties in the Agreement. Nor has
Greenstar shown, more generally, that the MBG stockpiles represent an environmental
issue. Therefore, there is no breach of § 3.21(k) of the Agreement.[24]

---

[23]The DEP 2003 Letter did express concern about runoff from certain MBG
stockpiles entering a waterway, Hokendauqua Creek. (JTX 3 at GSTH0023937037-38)
In this regard, it requested "[a] stormwater management plan and implementation
schedule to assure the prevention of stormwater run-off from the glass stockpiles into
Hokendauqua Creek." (JTX 3 at GSTH0023937038) However, Heller's response that
its stormwater management plan has been in effect since March 2000 under Permit No.
PAR 602229 was considered responsive to the DEP's request. (D.I. 78 at 227:23-
228:8; *see* JTX 4 at GSTH0018786) In 2009, the DEP again raised concerns about
runoff into Hokendauqua Creek in internal correspondence. (*See* JTX 18) However, it
is unclear to what extent Greenstar contributed to such conditions after the Closing
Date by adding contaminated material to the MBG stockpiles. In any case, Greenstar's
briefs do not argue that the concerns about Hokendauqua Creek constitute an
Environmental Matter.

[24]For the same reasons, the court finds that there is also no breach of § 3.21(j)
regarding "Environmental Response," which Greenstar asserts in a footnote. (*See* D.I.
81 at 27 n.30) "'Environmental Response' means any action necessary to comply with
and ensure compliance with Environmental Laws or to prevent, respond to, remove,
remediate, investigate or monitor the release or threatened release of Hazardous
Substances at, on, in, about, under, within or near the air, soil, surface water,

26

### b. Agreement § 3.17 – compliance with laws and contracts

54. Greenstar contends that Heller also breached § 3.17 of the Agreement by

untruthfully representing that: (1) the existence of the MBG stockpiles did not, and

could not, directly or indirectly result in a violation of any law or regulation; and (2) no

investigation or review was pending or threatened regarding the MBG stockpiles. (D.I.

81 at 25) Section 3.17 provides, in relevant part:

#### 3.17 **Compliance with Laws, Contracts.**

(a) Except as set forth in Schedule 3.17[25] or except as would not or could not reasonably be expected to result, individually or in the aggregate, in a Liability in excess of $100,000, the Seller is not and has not been in the past four (4) years in violation of, and has not been given notice or been charged with any violation of, any Legal Requirement[26] (including, without limitation, any Environmental Law) of any Governmental Authority. No event has occurred, and no condition or circumstance exists, that might (with or without notice or lapse of time) constitute or result directly or indirectly in a violation of any Legal Requirement. No investigation or review by any Governmental Authority is pending or, to the Seller Parties' Knowledge,[27] threatened, nor has any Governmental Authority indicated an intention to conduct the same.

---

groundwater, or other environmental media." (JTX 16, Annex A-4)

[25]Schedule 3.17 sets forth two "Material Violations" unrelated to the MBG stockpiles, as well as several "Governmental Authorizations" held by Heller. (JTX 17, Schedule 3.17)

[26]Pursuant to the Agreement, "Legal Requirement" means "any law, statute, ordinance, decree, requirement, Order, treaty, proclamation, convention, rule or regulation (or interpretation of any of the foregoing) of, and the terms of any Governmental Authorization issued by, any governmental Authority." (JTX 16, Annex A-6)

[27]"Knowledge" means, for individuals, actual awareness or constructive awareness (if they "could reasonably be expected to become aware of such fact or matter after due inquiry"). (JTX 16, Annex A-6) For entities, knowledge is established if any director or key employee had actual knowledge or constructive knowledge, as defined above. (*Id.*)

27

(JTX 16, § 3.17(a))

55.   Again, it is undisputed that the DEP never issued a notice of violation regarding the MBG stockpiles, asked Heller or Greenstar to enter into a consent order, or issued any fine related to the MBG stockpiles.  The DEP 2003 Letter contained the only mention of a Legal Requirement – § 285.113.  As discussed *supra*, that letter was written on June 12, 2003 as a request from the DEP for more information to determine whether Heller was in compliance with § 285.113, which regulates the duration of waste storage; the DEP had not yet made any determination of compliance or noncompliance with § 285.113.  As such, the DEP 2003 Letter does not fall under the scope of the first sentence of § 3.17(a) for two reasons:  (1) it was written more than 4 years before the closing date of the Agreement; and (2) it was not a notice, or charge of violation, of § 285.113.  In addition, the situation surrounding the unprocessed MBG at the time does not place it within the scope of the third sentence of § 3.17(a); as discussed *infra*, there was no investigation or review that was pending or, to Heller's knowledge, threatened, as of the closing date.

56.   The second sentence of § 3.17(a), however, is not subject to the 4-year limitation and requires disclosure of any condition or circumstance "that **might** (with or without notice or lapse of time) constitute or result directly or indirectly in a violation of any Legal Requirement."  (Emphasis added)  The plain meaning of this unambiguous language broadly encompasses any potential violation of a Legal Requirement, regardless of notice or lapse of time.  In contrast to the term "Environmental Law" in § 3.21(k), a Legal Requirement is not limited to regulations regarding health, the environment, or Hazardous Substances.  At the time of closing, Heller had been

advised of the DEP's concern about the unprocessed MBG and its interest in

determining compliance with § 285.113. Because of correspondence with the DEP,

Heller was engaged in fulfilling a commitment to process the MBG at a target rate and

to provide monthly reports to the DEP. The situation was such that failing to meet

those commitments could have resulted in the DEP finding a violation of § 285.113.

That the DEP has thus far not found a violation of § 285.113 or taken formal action is of

no avail to Heller. Therefore, Heller breached its obligation to inform Greenstar at the

time of closing that Heller had made certain promises and representations to the DEP

in response to, at minimum, the DEP's interest in determining compliance with a

regulation.

### c. Agreement § 3.7 – liabilities over $100,000

57. Greenstar further alleges that Heller breached § 3.7, which provides:

3.7 **Absence of Undisclosed Liabilities.**
The Seller has not occurred any Liabilities of any nature, except Liabilities
. . . (iii) that do not exceed, individually or in the aggregate, $100,000.

(*Id.*, § 3.7) Greenstar avers that it has spent over $1 million thus far to remove the

MBG stockpiles from the Facility.

58. The "Liabilities" contemplated by § 3.7 are not limited to liabilities arising

from Legal Requirements or formal DEP actions. Rather "Liability" is broadly defined in

the Agreement as "any debt, obligation, duty or liability of **any nature** (including

unknown, undisclosed, unfixed, unliquidated, unsecured, unmatured, unaccrued,

unasserted, contingent, conditional, inchoate, implied, vicarious, joint, several or

secondary liability)," as well as strict liability (whether arising under Environmental Laws

29

or otherwise). (*Id.*, Annex A-6) (emphasis added)

59. As of the closing date, Heller had Liabilities related to its commitment to

process 200 tons of the unprocessed MBG per day and to submit monthly reports, per

the DEP's request. These commitments were obligations or duties, whether self-

imposed by Heller or required by the DEP, under the broad definition of "Liabilities" that

the parties contracted to in the Agreement.[28] Heller did not disclose these Liabilities to

Greenstar and, as such, breached § 3.7 of the Agreement.

### d. Agreement § 3.26 – disclosure

60. Finally, Greenstar asserts that Heller's non-disclosures breached § 3.26

because they were misstatements or untrue statements that adversely affected the

Facility or its operations, as required by the provision:

> 3.26 **Disclosure.**
> No representation or warranty or other statement of the Seller Parties
> contained herein, in schedules hereto or in any document or agreement
> contemplated hereby contains any untrue statement of a material fact or
> fails to state a material fact necessary to make the statements herein or
> therein not misleading. There is no fact that has any specific application
> to Seller (other than general economic or industry conditions) and that
> materially adversely affects the assets, business, prospects, financial
> condition, or results of operations of Seller that has not been set forth in
> this Agreement.

(*Id.*, § 3.26)

61. As discussed *supra*, Heller failed to disclose facts necessary to make at

least the representations and warranties under §§ 3.17 and 3.7 not misleading. These

omissions were material because, despite Greenstar's knowledge of the MBG

---

[28]Heller does not dispute Greenstar's assertion that the undisclosed Liabilities
exceeded $100,000. (*See* D.I. 81 at 28; 82 at 24-25)

stockpiles' existence at closing and its plans to process MBG using its upgraded glass

plant, Greenstar was not under the impression that the DEP had any interest in the

MBG, that there existed any obligations to the DEP, or that the Facility had the potential

to be in violation of § 283.115. Had Greenstar known these facts, it might have

negotiated the acquisition of the Facility differently. (See D.I. 78 at 92:9-12) The DEP's

post-closing visits and correspondence related to the MBG stockpiles caught Greenstar

by surprise and caused Greenstar to submit and execute plans to satisfy the DEP's

desire for timely removal of the MBG stockpiles, including the historical unprocessed

MBG. Therefore, Heller breached § 3.26.

### e. "Excluded Liabilities" provision

62. The Agreement also provided that Greenstar did not assume certain

liabilities, or "Excluded Liabilities," including:

> [A]ny Environmental Claim or conditions that **could** give rise to or relate to
> Liability under Environmental Laws or similar legal requirements attributable or
> **relating to the Assets** (including, without limitation, the operation thereof), the
> real estate that is the subject of the Lease Agreement, the Business, or the
> Seller Parties, including any Liability . . . or obligation arising under or relating to
> Environmental Laws with respect to the Business Facilities based upon facts
> existing or circumstances occurring on or before the Closing Date or resulting
> from, caused by or related to any act or omission of . . . any Seller Party or any
> current or former officer, director, partner, employee . . . of any Seller Party
> which occurred on or prior to the Closing Date, the existence, presence,
> dispersal, release or migration of any Hazardous Substances or damage to
> natural resources on, under, about or within any solid, groundwater or other
> media at any facility or property owned, operated, leased, managed or otherwise
> controlled by a Seller Party . . . that were occurring or in effect on or prior to the
> Closing Date;
>
> . . . .
>
> [A]ny Liability that **arises out of or relates to the ownership or operation of
> the Business or the Assets** on or prior to the Closing Date . . . ."

(Id., §§ 1.3(g) & (m)) (emphasis added)

31

63. Again, the unprocessed MBG did not relate to any Liability or potential Liability under an Environmental Law. However, as discussed *supra*, Heller did have a Liability – as the term is defined in the Agreement – prior to the Closing Date, in the sense that it had an obligation or duty to process MBG at a certain rate and provide updates to the DEP.

64. Heller tries to use a distinction between "Asset" and "Excluded Asset" to argue that the Excluded Liabilities provision is inapplicable to any of the MBG stockpiles. Heller contends that all glass at the Facility was separately transferred to Greenstar pursuant to the inventory contract, so that the MBG was not an "Asset" under §§ 1.3(g) and (m), but an "Excluded Asset" under § 1.2 of the Agreement.[29] (D.I. 83 at 27) Even if Heller is correct, however, § 1.3(d) includes as an Excluded Liability "any Liabilities arising out of or in connection with the Excluded Assets."[30] Therefore, regardless of whether the MBG stockpiles were Assets or Excluded Assets, they fall within the broad language of the Excluded Liabilities provision and gave rise to an Excluded Liability.

## 2. Agreement §§ 6.1, 6.2 – indemnification

65. A plaintiff's claim for breach of the indemnification provisions of the

---

[29]Section 1.2 of the Agreement enumerates the Excluded Assets, which "the Seller is not selling and the Buyer is not purchasing pursuant to th[e] Agreement . . . ." (JTX 16, § 1.2)

[30]Heller also avers that Greenstar created its own Liability through its business decision to run historical MBG, rather than MRF-generated glass, through its upgraded glass facility. (D.I. 83 at 27) However, the Excluded Liabilities provision unambiguously disclaims all liabilities that are not express "Assumed Liabilities" described in Schedule 1.3. (*See* JTX 16, § 1.3; JTX 17, Schedule 1.3)

32

Agreement becomes ripe after liability for breach of the Agreement (by

misrepresentation or otherwise) has been established. *See LaPoint v.*

*AmerisourceBergen Corp.*, 970 A.2d 185, 197-98 (Del. 2009) ("In a contract . . . in

which one party agrees to indemnify the other for damages, including attorneys' fees,

arising from the party's breach of the contract, the term 'indemnity' has a distinct legal

meaning that permits the party seeking indemnification to bring a separate cause of

action for indemnification after first bringing a successful action for breach of the

contract."). Because Greenstar has established liability for breach of the Agreement,

the court next addresses the indemnification provisions of the Agreement.

66. Greenstar argues that two sections of the Agreement provide for

indemnification. Article VI of the Agreement requires Heller to indemnify Greenstar for

"each and every Loss"[31] resulting from:

> 6.1 **Indemnification by the Seller Parties.**
> . . . (A) any inaccuracy in any representation or warranty of the Seller
> Parties under this Agreement . . . ; (C) the ownership, management or
> operation of the Assets prior to the Closing Date . . . ; (D) any Excluded

---

[31]The Agreement defines "Loss" broadly as:

> any loss, damage, injury, harm, detriment, decline in value, Liability,
> exposure, claim, demand, Proceeding, settlement, judgment, award,
> punitive damage award, fine, penalty, Tax, fee, charge, cost or expense
> (including, without limitation, costs of attempting to avoid or in opposing
> the imposition thereof, interest, penalties, costs of preparation and
> investigation, and the reasonable fees, disbursements and expenses of
> attorneys, accountants and other professional advisors), as well as with
> respect to compliance with the Requirements of Environmental Law,
> expenses of Remediation and any other remedial, removal, response,
> abatement, cleanup, investigative, monitoring, or record keeping costs
> and expenses, but shall not include consequential damages.

(JTX 16, Annex A-6)

Liability; [and] (E) any fraud, intentional misrepresentation or similar circumstances . . . .

. . . .

6.2 **Environmental Indemnification.**

. . . any Environmental Claim asserted against Buyer's Indemnified Persons or for which Buyer's Indemnified Persons otherwise becomes liable, or any actual or threatened violation of or non-compliance with, or any Environmental Response obligation arising under, any Environmental Laws, . . . which has its basis in or which arises from any . . . circumstance . . . existing, commencing, or occurring prior to the Closing and which relates in any way to (i) the Seller, or any of the Assets, . . . Excluded Equipment or Inventory, or the conduct of the Business prior to the Closing; (ii) the presence of any Hazardous Substances exceeding naturally-occurring concentrations on, in, under or affecting all or any portion of any Business Facility, and any release or threatened release with respect to such Hazardous Substances; and/or (iii) the storage, disposal or treatment, or transportation for storage, disposal or treatment, of Hazardous Substances.

(JTX 16, §§ 6.1 & 6.2)

67. As the court does not find that the withheld information regarding the MBG

stockpiles was related to any environmental issue under the Agreement, § 6.2 does not

provide a basis for indemnification. However, § 6.1 unambiguously contemplates

indemnification for "any inaccuracy in any representation or warranty" and "any

Excluded Liability," and the "Loss" that the parties contemplated included "any loss,

damage, injury, harm, detriment . . ., cost or expense" arising therefrom. Heller has

breached three express representations and warranties under the Agreement, and the

MBG stockpiles were an Excluded Liability. Accordingly, Greenstar is entitled to

indemnification pursuant to §§ 6.1(A) and (D) if it can establish that its Loss resulted

from Heller's inaccurate representations or the MBG as an Excluded Liability.

### 3. Resulting damages to Greenstar

68. The MBG stockpiles could be viewed as a source of revenue or loss,

34

depending on the market. When there is a demand for MBG, whether processed or not, it would be considered a revenue source; when there is little or no demand for MBG – as seems was the case for Heller and now is the case for Greenstar – it would be considered an unsightly space filler. Tomayko's testimony indicates that, had the DEP not been satisfied with Greenstar's response to its concerns, the DEP would have considered formal sanctions, such as entering into a consent order. Therefore, the DEP's interest in the MBG, including historical unprocessed MBG, at the Facility directly caused Greenstar to develop and execute an MBG removal plan in response, rather than leaving open the option to search for or develop markets for the on-site MBG.

69. Although Greenstar knew about the MBG stockpiles and had already planned to spend a significant amount of money to process and remove the MBG, its plans at the time of closing were unrelated to the DEP's concerns. Heller's breach of §§ 3.17, 3.7, and 3.26 of the Agreement caused Greenstar to rely on misinformation when it acquired the Facility and directly led to Greenstar's Loss, to the extent it can be traced to the unprocessed MBG – an Excluded Liability – that Heller left at the Facility.

70. "It is a basic principle of contract law that remedy for a breach should seek to give the nonbreaching party the benefit of its bargain by putting that party in the position it would have been but for the breach." *Genecor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000). Where a wrong has been proven and injury established, "lack of mathematical certainty [is] permissible so long as the Court has a basis to make a responsible estimate of damages." *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999). The parties agree that, if damages are to be awarded, the proper measure should be based on Greenstar's costs to remove the tonnage of MBG

35

present in the relevant piles as of the Closing Date in September 2007. (*See* D.I. 81 at 35; D.I. 82 at 34-35)

71. However, as a threshold matter, the parties dispute which piles of glass are relevant for purposes of damages. As of the Closing Date, Piles 53, 56, 60, 63, 66, 73, 76, 80, 83, and 90, as identified in the 2007 Survey, contained over 102,000 cubic yards of broken glass. (JTX 15) Greenstar contends that the DEP required all 11 of those piles to be eliminated from the Facility and, thus, seeks damages for the costs of removing all of them. (D.I. 78 at 48:11-15, 52:6-19, 56:24-57; D.I. 79 at 256:22-257:1, 260:22-25) Heller, on the other hand, argues that only Pile 90, the largest pile, is at issue because the DEP was only concerned with **unprocessed** stockpiles when Heller owned the Facility. (D.I. 79 at 431:1-3; D.I. 80 at 518:22-519:4, 521:13-25) As discussed *supra*, the court agrees that the documentation and correspondence between Heller and the DEP indicate that, when Heller owned the Facility, the DEP was focused on removal of the unprocessed MBG on site. Moreover, Greenstar has not shown to what extent the DEP's request to remove all 11 piles was due to historical unprocessed MBG left by Heller and not Greenstar's own addition of new materials to the stockpiles. A worksheet prepared on July 31, 2007 ("the 2007 Worksheet") confirms that Pile 90 was the only pile at the time[32] that contained unprocessed MBG, or broken glass that was not sorted by color or size and was not readily marketable.[33]

---

[32]It is unclear whether the DEP 2003 Letter and Heller's 2003 Response referred to one or multiple stockpiles of unprocessed MBG, but the evidence shows that, by July 2007, the only pile of unprocessed MBG left was Pile 90.

[33]As of the Closing Date, the other piles for which Greenstar seeks damages were processed either by size, color, or end use and could be marketed as-is. (*See*

36

(DTX 33 at GSTH0021101) It is undisputed that Pile 90 contained 44,240 cubic yards of material as of the Closing Date. (See id.; JTX 15 at HELLER00005637)

72. A difficulty in calculating damages arises because Greenstar's cost of removal is by weight (per ton), whereas Pile 90 was surveyed in terms of volume (cubic yards). Greenstar and Heller disagree on the appropriate cubic yards-to-tons conversion factor to use for determining the weight of Pile 90. Greenstar is unable to determine the exact volume-to-weight conversion factor for the stockpiles but asserts that the factor should be between 1.3-1.5 tons per cubic yard, so that the material in Pile 90 weighed between 57,512 and 66,360 tons on the Closing Date. (DTX 53; D.I. 81 at 13) Heller believes that the proper conversion factor should be 0.756 tons per cubic yard, such that Pile 90 weighed 33,445.44 tons as of the Closing Date. (DTX 33)

73. Greenstar's proposed range of conversion factors is based on Smith's assertion in a September 2011 email that, for historical MBG, a "rate of 1.5 should be applied for the length of time the piles have been [on site]." (JTX 26 at GSTH0024262; see D.I. 79 at 277:16-278:1, 279:17-280:14) Another email, from Steve Kolbe of Coplay in June 2011, supplies the lower end of Greenstar's proposed range; in it, Kolbe simply stated, "[T]he normal conversion for dirt or stone from [cubic yards] to tons is approximately 1.5 . . . . Because [the MBG] includes some comingled [sic] paper and plastic I would use a[] smaller number, perhaps 1.3 to 1.4." (PTX 69 at GSTH0010524) At trial, Smith vaguely asserted that his 1.5 conversion factor was based on internet research, talking to unidentified people about the conversion factor, the length of time

---

DTX 33 at GSTH0021101; D.I. 79 at 441:16-442:6, 466:19-467:8) Pile 90 was the only glass pile identified as "3 Mix." (DTX 33 at GSTH0021101)

the stockpiles existed, unidentified environmental factors, and the fact that the MBG was compacted into a road to allow a dump truck to drive on it. (D.I. 79 at 278:2-20, 280:15-20) The court finds Kolbe's estimate to be unreliable because it was premised on a conversion factor for dirt or stone, not glass, and the court did not find Smith's testimony convincing. Also, importantly, Greenstar's proposed conversion rates are derived from emails sent in 2011, approximately 4 years after the Closing Date. To the extent any support can be gleaned for Greenstar's proposed conversion factors, they are based largely on the passing of time, weathering, and compacting that occurred **after** the closing date. Therefore, the court does not find Greenstar's proposed conversion factors to be reliable, persuasive, or applicable.

74. On the other hand, Heller points to the 2007 Worksheet, which uses a cubic yards-to-tons conversion factor of 0.756 for Pile 90. (DTX 33 at GSTH0021101) The conversions in the 2007 Worksheet were made just prior to the Closing Date, and Dunn noted in 2009, prior to litigation, that "[w]e must use the same conversion factor." (*Id.* at GSTH0021099) Michele Kaczmarek ("Kaczmarek") similarly observed at the time that the yards-to-tonnage conversion factors "should be the same," even if Greenstar's beginning inventory numbers were different. (*Id.*) Using the 0.756 conversion factor, the 2007 Worksheet estimated that the 44,240 cubic yards of MBG in Pile 90 weighed 33,445.44 tons. (*See id.* at GSTH0021101)

75. Although the court recognizes that the density of the historical unprocessed MBG might have increased since 2007, the court looks to the weight of the material as

of the Closing Date.[34]  Given the use of the 0.756 conversion factor by THI in 2007 and again by Dunn and Kaczmarek prior to litigation,[35] that number is the most reliable estimate that the court has to the true conversion factor.

76. The parties also dispute the appropriate cost per ton to remove the unprocessed MBG. Greenstar submits that its cost of MBG removal is $12.00 per ton, based on the contracted price of $9.15 per ton with Coplay and additional costs detailed in the evidence. (See D.I. 79 at 267:18-268:12; PTX 76)  The court finds that Greenstar's submission of $12 per ton is an appropriate and reliable estimate. See Bomarko, 794 A.2d at 1184 (finding that "mathematical certainty" is not required, "so long as the Court has a basis to make a responsible estimate of damages").

77. Using the numbers above, the court finds that Heller must indemnify Greenstar, against the balance of the Note, for $401,345.28:

$$33,445.44 \text{ tons} \times \$12.00 \text{ per ton} = \$401,345.28.$$

## B. Fraud

78. As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort. See Garber v. Whittaker, 174 A. 34, 35 (Del. Super. 1934). "A breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently

---

[34]Given a fixed amount of unprocessed MBG at the time of closing, an increase in density would decrease the volume of the material but would not change its weight.

[35]The conversion factors in the 2007 Worksheet were also apparently vetted by a third party, KPMG LLC.  (DTX 33 at GSTH0021099)

induced' or by alleging that the contracting parties never intended to perform." *Iotex Commc'ns, Inc. v. Defries*, Civ. No. 15817, 1998 WL 914265, at \*5 (Del. Ch. Dec. 21, 1998); *see also Cornell Glasgow, LLC v. LA Grange Props., LLC*, Civ. No. N11C-05-016 JRS CCLD, 2012 WL 2106945, at \*8 (Del. Super. June 6, 2012) (citing *Kuroda v. SPJS Holdings LLC*, 971 A.2d 872, 889 (Del. Ch. 2009)) (same).

79. However, the same circumstances may give rise to both breach of contract and tort claims if the tort claim involves "violation of a duty which arises 'by operation of law and not by the mere agreement of the parties.'" *Cornell Glasgow*, 2012 WL 2106945, at (quoting *Data Mgmt. Internationale, Inc. v. Saraga*, Civ. No. 05C-05-108, 2007 WL 2142848, at \*3 (Del. Super. July 25, 2007)).

80. The only duty that Greenstar alleges either Mr. Heller or THI had outside of those that arose under the Agreement was Mr. Heller's fiduciary duty in the capacity of president and general manager of Greenstar after the Agreement's closing. This is a new theory that Greenstar presented for the first time at trial and in its post-trial briefing. Greenstar's theory for breach of fiduciary duty was not in its complaint, responses to interrogatories, or pre-trial order. (*See* DTX 47, 49, 52, 53) As such, the court declines to address this argument.

81. Claims for fraud can coexist with claims for breach of contract where a defendant committed intentional fraud, or "acted with an illicit state of mind, in the sense that the Seller knew that the representation was false and either communicated it to the Buyer directly itself or knew that the Company had." *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1036, 1064 (Del. Ch. 2006) (requiring, for

40

intentional fraud, that defendants acted in more than a "reckless, grossly negligent, or negligent manner"); *see also Cobalt Operating, LLC v. James Crystal Enterprises, LLC*, Civ. No. 714, 2007 WL 2142926, at \*27 (Del. Ch. July 20, 2007) (finding that a plaintiff that established its right to recover under a breach of contract claim also satisfied the elements of common law fraud because the defendant "intentionally" provided false information upon which the plaintiff reasonably relied).

82. Greenstar has failed to meet its burden of proving that Mr. Heller committed intentional fraud. It asserts that Mr. Heller knowingly and deliberately concealed information. (*See* 81 at 34; D.I. 83 at 18) There is no dispute that Mr. Heller had knowledge of the DEP's interest in the unprocessed MBG and of Heller's underlying correspondence with the DEP, but the portions of testimony that Greenstar cites to do not persuade the court that Mr. Heller intentionally made false representations or omissions to induce Greenstar to act. Mr. Heller's testimony merely establishes his belief that information regarding the unprocessed MBG was a "non-issue" because it did not involve Hazardous Substances. (*See* D.I. 79 at 444:17-446:2; D.I. 80 at 565:9-567:10) It is at least just as likely that Mr. Heller was under the mistaken impression that his omissions were irrelevant. Greenstar has not submitted any other evidence to support its assertion that Mr. Heller acted with an illicit state of mind. Therefore, the weight of the evidence does not show, more likely than not, that Mr. Heller acted with an illicit state of mind.

83. Greenstar's claim for fraud also fails for another reason. Greenstar failed to demonstrate damages caused by the fraud "separate and apart from" the alleged breach of contract damages. *Cornell Glasgow*, 2012 WL 2106945, at \*8 ("[T]he [fraud]

41

damages . . . may not simply 'rehash' the damages allegedly caused by the breach of

contract.").

## C. Attorney Fees

84. As the prevailing party, Greenstar requests reimbursement for its attorney

fees and costs, in addition to damages. (D.I. 81 at 40) The Agreement contains the

following fee-shifting provision:

> In the event of any litigation arising out of or connected in any manner
> with this Agreement, the non-prevailing party shall pay the costs of the
> prevailing party, including its reasonable attorney and paralegal fees and
> expenses incurred in connection therewith through and including the costs
> of any appeals and appellate costs relating thereto. This Section shall
> survive the Closing or the termination of this Agreement.

(JTX 16, § 7.12)

85. Fee-shifting provisions are enforced under Delaware law. *See, e.g., Aveta*

*Inc. v. Bengoa*, Civ. No. 3598-VCL, 2010 WL 3221823, at *6 (Del. Ch. Aug. 13, 2010);

*ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50

A.3d 434, 439 (Del. Ch. 2012). When determining the scope of recovery under such a

provision, "[c]ourts focus principally on enforcing the parties' agreement to make the

prevailing party whole." *Aveta*, 2010 WL 3221823, at *6. "'Absent any qualifying

language that fees are to be awarded claim-by-claim or on some other partial basis, a

contractual provision entitling the prevailing party to fees will usually be applied in an

all-or-nothing manner.'" *ASB Allegiance*, 50 A.3d at 439 (quoting *W. Willow-Bay Court,*

*LLC v. Robino-Bay Court Plaza, LLC*, Civ. No. 2742-VCN, 2009 WL 458779, at *8 (Del.

Ch. Feb. 23, 2009)).

86. The court ordered Greenstar to release $8,410,000 of the $11,410,000 of

42

the Note that was originally withheld from Heller. (D.I. 72, 75, 76) Heller asserts that, "[o]n that basis alone, [it] has significantly succeeded on its counterclaims and is entitled to its attorney[] fees and costs" as well. (D.I. 82 at 40) However, the amount of the Note withheld is not an indication that Heller prevailed, only a reflection of the potential damages at issue if Heller did not prevail. Because the fee-shifting provision contains no qualifying language, the court will apply it in an all-or-nothing manner. The court awards Greenstar, as the prevailing party, reasonable attorney fees and costs pursuant to § 7.12 of the parties' Agreement.

## IV. CONCLUSION

87. For the foregoing reasons, Heller has breached §§ 3.17, 3.7, and 3.26 of the Agreement, and the liabilities related to the unprocessed MBG are Excluded Liabilities, as defined in the Agreement. Greenstar is awarded $401,345.28 in damages, to be offset against the Note, as well as reasonable attorney fees and costs. The remaining balance of the Note, if any, shall be released to Heller. An appropriate order shall issue.